Filed 3/11/16  P. v. Perry CA2/4

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE, | B260958 |
| Plaintiff and Respondent, | (Los Angeles County |
| v. | Super. Ct. No. BA390640) |
| MICHAEL LYNN PERRY, SR. | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Jose I. Sandoval, Judge.  Affirmed.

David D. Carico, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Scott A. Taryle and Eric J. Kohm, Deputy Attorneys General, for Plaintiff and Respondent.

## INTRODUCTION

Defendant Michael Perry appeals from the judgment entered following his conviction by jury of the second degree murder of his wife, Sharon M.[1] Defendant was sentenced to a total term of 60 years to life. He asserts numerous bases for appeal, including the erroneous admission of evidence of a prior uncharged act of domestic violence, the erroneous exclusion of evidence regarding substance abuse, instructional error, prosecutorial misconduct, and ineffective assistance of counsel. We affirm.

## FACTUAL AND PROCEDURAL HISTORY

A.      *Procedural Background*

The Los Angeles County District Attorney (the People) filed an information on May 29, 2012 charging defendant with one count of murder. (Pen. Code, § 187, subd. (a).)[2] The information further specially alleged that defendant personally used a firearm, a handgun, which caused death (§ 12022.53, subds. (b)-(d)), and suffered a prior conviction of a serious felony (§§ 667, subds. (b)-(i), 1170.12, subds. (a)-(d).) Defendant pleaded not guilty and denied the special allegations.

Following a jury trial, defendant was found guilty of second degree murder. The jury further found the firearm special allegations true. Defendant waived his right to a trial on the prior conviction allegations and subsequently admitted them. The court sentenced defendant to a total term of 60 years to life—a base term of 15 years to life, plus 25 years for the firearm enhancement and 20 years for the prior conviction. Defendant timely appealed.

B.      *Prosecution Case*

1.      *Background*

Defendant and Sharon had two children, now adults, both of whom testified for the prosecution at trial. Alesha Escobar, the couple's daughter, described her parents'

---

[1] The parties referred to Sharon by her first name throughout the trial. We adopt the same convention; no disrespect is intended.

[2] All further statutory references are to the Penal Code unless otherwise indicated.

relationship when she was a child as "a mixture of some good times and some bad times." She further described the "bad times" as including "abuse" inflicted by defendant upon Sharon, as well as arguments between her parents.

Specifically, Escobar recalled an incident when she was about eight years old, where she saw her father "lurch forward" toward Sharon, "grab her around the throat and choke her." Defendant was not living with them at the time, but had come for a visit. She was "standing outside the door" watching defendant and Sharon argue when defendant attacked and choked Sharon.

Defendant left home for about 13 years, starting when Escobar was about 12 years old. He returned in 2004, when she was about 25 years old. By that time, Escobar was living with her fiancé (now her husband). She did not have a relationship with defendant while he was away, but began to reestablish the relationship upon his return. Defendant moved back in with Sharon, and Escobar testified that "it appeared that they were doing well, they were reconciling." On cross-examination, Escobar stated when defendant reentered their lives in 2004, "he appeared to be a different person," and said "he wanted to be a positive person and spend time with his family." She was not aware of any physical violence between her parents during that time.

Michael Perry, Jr., defendant and Sharon's son, also denied witnessing any physical violence between his parents but said that defendant would threaten Sharon "regularly" every time they argued.[3] Perry, Jr., who had lived with his parents in the West Adams apartment for five years at the time of the shooting, testified he "didn't get along well" with defendant. "Within days" of Sharon's murder, Perry, Jr. heard an argument between his parents that started when defendant called Perry, Jr.'s girlfriend "a prostitute." During that argument, defendant asked Sharon "Are you ready to die?"

---

[3] Neither Escobar nor Perry, Jr. was aware of any guns in the house.

3

## 2.  *The Shooting*

In the afternoon of November 1, 2011,[4] Escobar met defendant at a relative's home to help him with some work related to a book defendant was writing.  Defendant was not "tech savvy," so Escobar signed him up for a Facebook account to promote his book.  Defendant indicated in his Facebook profile he was "interested in women" and did not disclose he was married.

That evening, Escobar had dinner with defendant and Sharon at their apartment on West Adams Boulevard in Los Angeles (the West Adams apartment).  Sharon complained about defendant's Facebook profile to Escobar and defendant, stating that defendant was "being disrespectful by allowing women to message him with . . . flirtatious messages."  Defendant replied "he wasn't really interested in other women, but that he wanted them to believe in . . . a fantasy that he could be interested in them" in order to promote his book.  According to Escobar, Sharon looked "sad and hurt," so Escobar logged in to defendant's Facebook profile and changed his status to "married."  After that, Sharon "seemed to be more at ease" and said that was "all [she] wanted."  Sharon did not seem angry during this conversation, but defendant did.  After Escobar changed defendant's Facebook profile, defendant remarked about Sharon that he would "pop a cap in her ass and then she'll shut up."  He made this statement about three times in the span of a few minutes, in front of both Sharon and Escobar, and seemed angry each time.  According to Escobar, Sharon did not verbally respond, but made a "gesture like whatever" with her hand, and "just blew off the comment."  Escobar left the West Adams apartment about an hour later and did not see her mother alive again.

The next day, November 2, 2011 at around 6:30 p.m., Perry, Jr. and his girlfriend, Shirley Francillon, were at the West Adams apartment with Sharon.  Francillon testified Sharon seemed upset about defendant's Facebook page and told them she planned to

---

[4] There was some inconsistency in the testimony by defendant's children regarding dates.  However, the parties later stipulated that Escobar saw defendant and Sharon on November 1, 2011, and Perry, Jr. and his girlfriend spoke with Sharon at her apartment on November 2, 2011, the evening she was killed.  We use these stipulated dates herein.

speak to defendant about it that night. Perry, Jr. said his mother never stated she was upset, but she remained "concerned" defendant was "speaking with other women on Facebook" and was going to talk to defendant about it.

Francillon and Perry, Jr. left the apartment between 7:30 and 8:00 p.m. They passed defendant, who was heading from the parking garage to the apartment, and Francillon testified defendant had a "snarl" or "upset look" on his face. She did not speak to defendant and Perry, Jr. stated he did not see defendant at that time. Francillon and Perry, Jr. went to Francillon's apartment and went to bed.

In the middle of the night, Perry, Jr. awoke "gasping for air." He felt like he "couldn't breathe," and told Francillon that he was "going to go get some air." He drove to the West Adams apartment, arriving there around 2:00 a.m. Perry, Jr. noticed all the lights were on in the apartment and that defendant's car was not in the garage, which was unusual. Perry, Jr. entered the apartment and went to his mother's room, where he saw her lying on the floor. He saw blood "all over the place," including on Sharon's body, on the floor, and the walls. Sharon was not breathing and did not have a pulse. Perry, Jr. ran for help and a neighbor called the police.

3.      *Defendant's Interview*

Defendant turned himself in to police on November 3, 2011, the morning after the shooting. Los Angeles Police Department (LAPD) Detectives Lait and Applegate interviewed defendant at approximately 10:30 a.m.. Portions of the video of the interview were played for the jury; they were also given copies of the interview transcript.

In the interview, defendant stated he had lived at the West Adams apartment for the past seven years, along with "Sharon [] my first wife," and Perry, Jr. After he was read his *Miranda*[5] rights, defendant described the events leading up to the shooting. A day or two before the shooting, he and Sharon had a discussion about his status on Facebook because Sharon "took it the wrong way," and after that discussion defendant

---

[5] *Miranda v. Arizona* (1966) 384 U.S. 436.

5

thought the matter was over. He arrived home later than usual on the evening of November 2, 2011, around 7:00 p.m., and asked Sharon if she would warm him up some food. According to defendant, Sharon replied "'I'm not cooking you shit' and then she just like started cussing, and then she jumped on me." Sharon tore his necklace off when she "jumped on" him.

Defendant said he had been "in and out of jail," but had been "clean" the past seven years and was trying "not to get into physical altercations" with Sharon. Sharon had "pulled a gun" on defendant once before, and that night, after Sharon "jumped" defendant, "she ran into the room, and I know [sic] she was running in there for the gun." Defendant then described the shooting: "So I ran in there behind her, and she had the gun, and I was - we was [sic] wrestling with it. And then she know [sic] I had the gun in my hand, and I had -- it was just like -- it was -- it was fast, man. It was like blurry fast. I had been drinking. [¶] And all I remember was just setting the gun down, and I just left."

Detective Lait testified that at the time of the interview he observed an injury to defendant's right hand, a red mark above defendant's right eyebrow, and some "small scabbed injuries" to defendant's right forearm; he did not observe any other injuries. During the interview, Detective Lait asked defendant about his swollen hand. Defendant said when he was trying to get the gun from Sharon, he "hit her to try to get the gun loose." The gun was kept on defendant's side of the bed; he said Sharon knew it had "one in the chamber and the clip," so it was "ready to go." As defendant was trying to get the gun loose, "we spun around and . . . it was just like in one motion. [¶] . . . and the next thing you know, I just saw flashes and . . . I just like put the gun down and I -- I left." Defendant said he did not know how many times he shot Sharon. When the detectives pressed him to recall how she was positioned when she was shot, defendant stated "I think she was laying on her back." In response to further questioning, defendant said it was "like a blur" and it "happened fast," and that he was drunk.[6] Defendant told

---

[6] There was no toxicology screen performed on defendant.

the detectives that, before going home that night, he had been at a friend's house, where they shared "two little [] bottles of Remy Martin."

After he left the apartment, defendant said he picked up his unemployment check and started "just driving," but then decided to turn himself in because he knew something "bad" had happened. He parked his car at his sister's house and walked to the police station.

### 4 *Investigation*

Detective Lait testified that the gun used in the shooting was registered to Sharon. On cross-examination, Detective Lait stated that he had interviewed Perry, Jr., who said he had never heard defendant threaten to kill Sharon.[7] Detective Lait acknowledged that this interview was about three hours after Perry, Jr. had discovered his mother's body, and he was "distraught" at the time.

LAPD criminalist Kristin Honig testified about her examination of the crime scene. Sharon was found lying on her back in the master bedroom, on the floor between a dresser and the bed. The majority of the blood stains in the bedroom were below the height of the dresser. Investigators recovered a firearms case containing a magazine with live ammunition from under a table on the right side of the bed. The gun was recovered from the top of the dresser. They also collected ten discharged cartridge cases from the bedroom. A black "leather-like necklace with a pouch" was recovered from on top of the headboard of the bed. The clasp of the necklace was torn. There was also marijuana in prescription bottles found on the floor in the entryway of the bedroom.

Criminalist Steven Tsurumoto testified that a bullet hole was found in the front face of the top dresser drawer, with the "projectile pathway" continuing downward through the bottom of the top drawer, through the middle drawer, and into the bottom drawer. A fired bullet was discovered on top of clothing in the bottom drawer. There was another bullet impact to the mirror on the dresser, going through into the wall.

Criminalist Jessica Moody examined a piece of carpet that was cut from the floor

---

[7] Perry, Jr. denied making this statement to the detective.

7

of the bedroom, underneath Sharon near the left side of her neck. There were two impact holes in the carpet and metal fragments were found on the underside. From her observation of the carpet and a chemical test for lead residue, Moody concluded that the holes were "consistent with the passage of a bullet."

Marissa Biraimah, another LAPD criminalist, examined the gun, a 9 millimeter Beretta handgun. This type of gun holds a ten-round magazine, and each shot requires a separate pull of the trigger. The cartridges cases and bullet recovered from the bedroom were examined and determined to have been fired from the gun recovered from the scene.

Medical examiner Dr. Ogbonna Chinwah performed the autopsy on Sharon on November 7, 2011. There were eight gunshot wounds in her body. He did not observe any other bruising. Dr. Chinwah testified regarding the entry and exit wounds for each bullet: (1) an entry wound on her upper cheek with an exit wound close to the ear (non-fatal); (2) an entry wound on the chin with an exit wound on the left side of the chin near the cheek (fatal); (3) an entry wound on the upper left side of the neck with an exit wound to the upper right of the neck (non-fatal); (4) an entry wound to the neck, directly below the previously-described wound, with an exit wound at the top of the left shoulder (non-fatal); (5) an entry wound in the neck with an exit wound on the back of the left shoulder (fatal); (6) an entry wound "right in the neck" with no exit wound (fatal, projectile was recovered from Sharon's left shoulder); (7) an entry wound in the right chest with an exit wound in the back of the right shoulder area (fatal); and (8) an entry wound in back of the head with no exit wound (fatal, projectile fragments recovered from Sharon's brain and scalp). Based on the location of the wounds and the trajectory, for bullet number eight, Sharon was "definitely" shot from the back. Wound numbers one through four were "atypical," indicating that the projectile may have hit something else before hitting Sharon.

Based on the absence of soot and stippling on the body, Dr. Chinwah opined that the muzzle of the gun was more than two feet away from Sharon when she sustained the gunshot wounds. He also testified that some of the wounds were sustained when Sharon

8

was at a position below the shooter. The autopsy report listed Sharon's cause of death as multiple gunshot wounds as a result of a homicide.

C. *Defense*

Defendant did not testify. He presented two witnesses in his defense. First, Dr. Kenton Wong, a forensics expert, testified that he had examined a diagram of the gun produced by investigators at the crime scene, which indicated a chemical test had detected blood "on the end of the muzzle." Based on those findings, Dr. Wong opined that there could have been "a close range shot" from the gun, causing "possible blow back of blood back into the barrel of the firearm." During cross-examination, Dr. Wong conceded that without photographs of the gun, there was no evidence establishing there was blood inside the gun barrel, and therefore no way to tell how far the gun was from the victim when it was fired.

Defendant also called Debra Kowal, LAPD criminalist, about her analysis of the gunshot residue samples collected from Sharon. She found particles of gunshot residue on both of Sharon's hands, from which she concluded Sharon could have discharged a firearm, or she could have been "otherwise in an environment of gunshot residue." On cross-examination, Kowal agreed "if a person is shot multiple times in a short range" (up to 14 feet away), she would "expect to see gunshot residue on them." Thus, while she could not "rule out" that Sharon had discharged a firearm, she could not tell conclusively what caused the gunshot residue on Sharon's hands.

**DISCUSSION**

A. *Admission of Prior Domestic Violence Incident*

On appeal, defendant challenges the trial court's admission of his prior uncharged act of domestic violence against Sharon, which occurred more than twenty years before Sharon's death. He contends the evidence was of questionable relevance and was extremely prejudicial, and that its admission was an abuse of discretion and deprived him of due process. We find no error and further find that any potential error was harmless.

9

1.    *Factual Background*

Prior to trial, the People moved to admit evidence of the following prior acts of domestic violence by defendant through Sharon's now-adult children:

(1)  Within the month prior to the murder, Perry, Jr. witnessed "almost daily arguments" between Sharon and defendant, including threats by defendant to Sharon "along the lines of 'Are you ready to die?'";

(2)  Daveisha Barfield, Sharon's eldest daughter and defendant's step-daughter, recalled acts of violence that occurred in the 1980s, when she was approximately five years old, including an occasion when she saw defendant beating Sharon "while atop her body," and an incident where defendant punched Barfield in the stomach.  When Barfield was in third or fourth grade, she and her siblings ran from their home because defendant had "armed himself with a shotgun."  When she was 13, defendant hit Sharon over the head with a brick.  Generally, Barfield remembered "ten to twenty acts of violence" by defendant against Sharon, "including numerous verbal threats to kill" Sharon.[8]

(3) Escobar recalled an incident when she was between eight and ten years old where she saw defendant "attack [Sharon] with his hands around the victim's throat."  When she was six, defendant swung a frying pan at Sharon but missed, instead hitting Escobar on the cheek.

The People argued that the evidence of defendant's prior acts was admissible under Evidence Code section 1109[9] to show his propensity to commit domestic violence.  Alternatively, the People sought admission under the "line of cases applicable to instances of criminal conduct between the same parties, as developed in" *People v. Zack* (1986) 184 Cal.App.3d 409 (*Zack*) and *People v. Linkenauger* (1995) 32 Cal.App.4th 1603 (*Linkenauger*).

At a pretrial hearing on the issue on June 23, 2014, defense counsel objected that the acts were "very remote in time," occurring 20 to 25 years ago.  In response to the

---

[8] Barfield did not testify at trial.

[9] For this section of the discussion only, all further statutory references are to the Evidence Code unless otherwise indicated.

court's questioning, the prosecutor stated that all three children were now adults, "in their twenties and thirties." She then acknowledged that the acts, other than the recent statement heard by Perry, Jr., were all over ten years old. The prosecutor noted the rebuttable presumption against admissibility for conduct over ten years old under section 1109, but argued that the 13 years defendant spent in prison "should not be included in calculating the age of the priors" because the abuse resumed (at least verbally) shortly after defendant was released from prison and moved back in with Sharon.

The discussion continued at a hearing the following day. The court indicated it had read *Zack* and *Linkenauger* and was tentatively inclined to admit the evidence under the rationale of those cases, to avoid a "'false aura of tranquility'" that could be inferred from defendant's statements about the relationship. The court then stated it would grant the motion and admit the "domestic violence statements pursuant to Evidence Code section 1109." Defense counsel again objected that the statements were very remote, uncorroborated and reflected uncharged conduct and that the witnesses were very young. The court responded that defense counsel could cross-examine the witnesses regarding the remoteness issue.

The court subsequently indicated it wanted to revisit the issue and "invite[d]" defense counsel to look at the case law and "some of the factors that I listed on whether or not I can exceed 10 years under 1109(e)" prior to the next hearing. When the hearing resumed a few days later, the People clarified that admission under *Zack* and *Linkenauger* would be an alternative basis to admission under section 1109, and that the former required the standard weighing of prejudice and probative value under section 352, including the remoteness of the acts, but did not raise the presumption against admission required for older acts under section 1109. The People further noted that if admitted under *Zack* and *Linkenauger*, instead of under section 1109, the evidence would not be admissible to show propensity. The prosecutor indicated she was seeking to admit the evidence as relevant to intent and motive, related to defendant's self-defense motive and

11

the "danger of leaving the jury with this false impression" regarding the tranquility of the relationship.[10]

The court stated it was "concerned about the age" of the choking incident and had reviewed other cases "in the 1109 context where . . . remoteness is a factor, but not the sole factor." "Factoring all that in and also looking at the 352 analysis" for the choking incident, the court found it admissible. The court excluded testimony about the frying pan incident, which occurred when Escobar was six years old, as the time period was "substantially longer" and the witness was "only in kindergarten at the time." The prosecutor inquired whether she could "generally ask the nature of the relationship between mother and father without . . . discussing specifics," and the court stated that she could. Defense counsel did not object to that inquiry.

### 2. *Legal Principles*

As a general rule, evidence of a person's character, including evidence of character in the form of specific instances of uncharged misconduct, is inadmissible to prove the conduct of that person on a specific occasion. (§ 1101, subd. (a).) This type of evidence is sometimes referred to as criminal disposition or propensity. (*Linkenauger*, *supra*, 32 Cal.App.4th at p. 1609.) The rule, however, is qualified by section 1101, subdivision (b) (section 1101(b)), which permits admission of evidence of uncharged misconduct when such evidence is relevant to establish some fact other than the person's character or disposition, such as "motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident."

Admission of evidence under section 1101 (b) is addressed to the sound discretion of the trial court. Evidence otherwise admissible under section 1101(b) must also be weighed pursuant to section 352: "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a)

---

[10] At this point, the prosecutor stated she would not be calling Barfield. The court indicated that Perry, Jr.'s testimony about defendant's recent threat to Sharon presented "no issue" and would be admitted. The remainder of the discussion thus focused on the relevance of the two statements by Escobar.

12

necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

Section 1109, subdivision (a) sets forth an exception to the rule regarding propensity evidence for domestic violence cases. Thus, "evidence of the defendant's commission of other domestic violence" is admissible as character evidence tending to prove the charged conduct, subject to section 352. The admissibility of propensity evidence pursuant to section 1109 "reflects the legislative judgment that in domestic violence cases, as in sex crimes, similar prior offenses are 'uniquely probative' of guilt in a later accusation," given the "'typically repetitive nature' of domestic violence." (*People v. Johnson* (2010) 185 Cal.App.4th 520, 532.) However, under section 1109, subdivision (e), "'Evidence of acts occurring more than 10 years before the charged offense is inadmissible . . ., unless the court determines that the admission of this evidence is in the interest of justice.' Thus, while evidence of past domestic violence is presumptively admissible under subdivision (a)(1), subdivision (e) establishes the opposite presumption with respect to acts more than ten years past." (*People v. Johnson, supra,* 185 Cal.App.4th at p. 537.)

We review a challenge to a trial court's decision to admit prior misconduct evidence for abuse of discretion. (See, e.g., *People v. Branch* (2001) 91 Cal.App.4th 274, 281–282.)

3.     *Evidence of the Choking Incident Was Admissible under Section 1101(b) and Related Case Law*

Defendant challenges only the admission of the prior choking incident on appeal. The parties argue regarding the admissibility of the incident under both sections 1101 and 1109. However, it is clear from the record the court ultimately admitted the evidence under *Zack* and *Linkenauger*, which flow from the principles of section 1101. Moreover, the prosecutor expressly withdrew her attempt to admit the choking incident as evidence of propensity under section 1109, and withdrew her request for the accompanying jury instruction (CALCRIM No. 852) allowing the jury to consider the evidence for propensity, and there is no evidence in the record that the court performed an analysis

13

under the "interests of justice" requirement of section 1109, subdivision (e).[11] We therefore focus our review on the trial court's admission of the evidence pursuant to *Zack*, *Linkenauger*, and section 1101.

In *Zack* and *Linkenauger*, both of which predate the enactment of section 1109 and involve a defendant convicted of murdering his wife, our sister courts concluded that an uncharged act of domestic violence committed by the same perpetrator against the same victim is admissible: "Where a defendant is charged with a violent crime and has or had a previous relationship with a victim, prior assaults upon the same victim, when offered on disputed issues, e.g., identity, intent, motive, etc., are admissible based solely upon the consideration of identical perpetrator and victim without resort to a 'distinctive modus operandi' analysis of other factors." (*Zack, supra*, 184 Cal.App.3d at p. 415.) Thus, in the context of a murder charge, "'[e]vidence tending to establish prior quarrels between a defendant and decedent and the making of threats by the former is properly admitted . . . to show the motive and state of mind of the defendant. . . .'" (*Linkenauger, supra*, 32 Cal.App.4th at p. 1612, quoting *People v. Cartier* (1960) 54 Cal.2d 300, 311; see also *People v. Daniels* (1971) 16 Cal.App.3d 36, 46 ["Evidence showing jealousy, quarrels, antagonism or enmity between an accused and the victim of a violent offense is proof of motive to commit the offense."].)

In *Linkenauger*, *supra*, 32 Cal.App.4th at p. 1613, the defendant argued that the Supreme Court's holding in *People v. Ewoldt* (1994) 7 Cal.4th 380, 402 (*Ewoldt*), requiring the prior offense to be "sufficiently similar" to the charged conduct, meant that "evidence of marital discord and prior assaults do[] not support the inference that he intended to commit a premeditated murder." The court disagreed, holding "the evidence had a tendency in reason to show appellant's intent to beat, torture, and ultimately murder JoAnn. It was properly admitted to show ill will and motive. [Citations.]"

---

[11] We reject defendant's contention that the court was required to apply the "interests of justice" restriction even when admitting the evidence under section 1101. Defendant's argument lacks supporting authority and is contrary to the language of the statutes, as well as well-established case law applying section 352 balancing to admission of prior acts under section 1101, as discussed herein.

(*Linkenauger, supra*, 32 Cal.App.4th at pp. 1613–1614.) Similarly, the courts in *Zack* and *Linkenauger* concluded the defendant was "not entitled to have the jury determine his guilt or innocence on a false presentation that his and the victim's relationship and their parting were peaceful and friendly." (*Zack, supra*, 184 Cal.App.3d at p. 416.)

Applying these principles here, the trial court correctly concluded the evidence of defendant's prior domestic violence against Sharon was relevant to show his ill will and intent to murder her. It was also relevant to rebut defendant's assertion that he acted in self-defense and to counter the suggestion, made by defendant in his police interview, that Sharon initiated any conflict in the relationship. The trial court did not err in admitting the evidence of the choking incident for these purposes. (See *Linkenauger, supra*, 32 Cal.App.4th at p. 1612; *People v. Kovacich* (2011) 201 Cal.App.4th 863, 893 [admitting evidence of domestic violence throughout nine years of marriage].) The defendant remained free to argue that the evidence was not relevant in light of the passage of time and evidence of his improved attitude upon his return home in 2004.

4. *No Abuse of Discretion in Admitting Prior Act Evidence Pursuant to Section 352*

Defendant also contends, even if the evidence of the choking incident was otherwise admissible, it should have been excluded as highly prejudicial under section 352. We review a challenge to a trial court's choice to admit or exclude evidence under section 352 for abuse of discretion, reversing only if the court's ruling was "arbitrary, whimsical or capricious as a matter of law. [Citation.]" (*Linkenauger, supra,* 32 Cal.App.4th at p. 1614.)

First, defendant questions whether the trial court "actually undertook any kind of materiality or prejudice analysis." However, the trial court "need not expressly weigh prejudice against probative value—or even expressly state that [it] has done so." (*People v. Mickey* (1991) 54 Cal.3d 612, 656.) Instead, the record need only demonstrate that the trial court "understood and fulfilled its responsibilities under Evidence Code section 352. Nothing more was required." (*People v. Garceau* (1993) 6 Cal.4th 140, 182.) Here, the court held several discussions on the record with counsel discussing the potential

admissibility of the choking incident and evaluating the appropriate presumption of admissibility. Ultimately, the court expressly noted, it was concerned about the remoteness of the prior incident, but nevertheless concluded the evidence was admissible under *Zack* and *Linkenauger*. On this record, it is clear the court properly discharged its responsibilities pursuant to section 352.

Turning to the substantive analysis, the standards are well-established for determining the admissibility of evidence of uncharged offenses under section 1101 (b) in light of section 352. (*Ewoldt, supra*, 7 Cal.4th at pp. 404-406.) The "probative value of the evidence must be balanced against four factors: (1) the inflammatory nature of the uncharged conduct; (2) the possibility of confusion of issues; (3) remoteness in time of the uncharged offenses; and (4) the amount of time involved in introducing and refuting the evidence of uncharged offenses. [Citation.]" (*People v. Branch, supra,* 91 Cal.App.4th at p. 282.)

We conclude the evidence was not unduly prejudicial when balanced against its relevance. "Without doubt, evidence a defendant committed an offense on a separate occasion is inherently prejudicial. [Citations.] But Evidence Code section 352 requires the exclusion of evidence only when its probative value is substantially outweighed by its prejudicial effect. 'Evidence is substantially more prejudicial than probative . . . [only] if, broadly stated, it poses an intolerable "risk to the fairness of the proceedings or the reliability of the outcome" [citation]' [Citation.]" (*People v. Quang Minh Tran* (2011) 51 Cal.4th 1040, 1047.)

Here, on one hand, "the prejudicial effect of the evidence is increased if the uncharged acts did not result in a criminal conviction. This is because the jury might be inclined to punish the defendant for the uncharged acts regardless of whether it considers the defendant guilty of the charged offense and because the absence of a conviction increases the likelihood of confusing the issues, in that the jury will have to determine whether the uncharged acts occurred. [Citation.]" (*Tran, supra,* 51 Cal.4th at p. 1047.) On the other hand, "the potential for prejudice is decreased . . . when testimony

describing the defendant's uncharged acts is no stronger or more inflammatory than the testimony concerning the charged offense. [Citation.]" (*Ibid*.)

With respect to the relative inflammatory nature of the evidence, we note that Escobar's testimony regarding the choking incident was brief and lacked detail. In contrast, the jury heard extensive testimony regarding the charged incident, including Perry, Jr.'s account of finding his mother's body in her blood-stained bedroom and the details of the numerous bullet wounds she sustained. As such, the potential for prejudice from the introduction of the choking evidence was decreased.[12]

The trial court also expressly considered the remoteness of the prior incident, noting it was "concerned" about this factor because the incident occurred more than 20 years before the murder. No specific time limits have been established for determining when an uncharged offense is so remote as to be inadmissible. (*People v. Harris* (1998) 60 Cal.App.4th 727, 739 ["there is no bright-line rule"].) Courts have admitted prior acts of a similar age, particularly where the acts were similar enough to the charged conduct to "'balance out the remoteness'" of the prior offense. (See *People v. Johnson, supra*, 185 Cal.App.4th at pp. 535-536 [admitting 18 year old act of domestic violence against defendant's prior girlfriend]; *Ewoldt, supra*, 7 Cal.4th at p. 405 [admitting 12 year old prior]; *People v. Waples* (2000) 79 Cal.App.4th 1389, 1393-1395 [admitting uncharged offenses involving the same victim occurring between 15 and 22 years before charged offense]; cf. *Harris, supra*, 60 Cal.App.4th at p. 739 [error to admit 23 year old offense when defendant had led a "blameless life" in the interim].) Here, the choking incident and Sharon's killing were similar in that there was evidence both incidents involved an argument between defendant and Sharon that escalated into serious physical violence against Sharon. While the type of violence was not identical, we are not persuaded the trial court abused its discretion in balancing the remoteness against the other factors and concluding the evidence was admissible. (See *Ewoldt, supra*, 7 Cal.4th at p. 402 ["[t]he least degree of similarity . . . is required in order to prove intent"]; *Linkenauger, supra*,

---

[12] Other than noting that the prior act was uncharged, defendant did not argue that evidence of the choking incident raised the possibility of confusion of the issues.

17

32 Cal.App.4th at p. 1613 [rejecting requirement of high degree of similarity for domestic violence incidents against the same victim, as "no one can kill the same victim twice"]; *People v. Johnson, supra*, 185 Cal.App.4th at p. 532 [enactment of section 1109 "reflects the legislative judgment that in domestic violence cases, as in sex crimes, similar prior offenses are 'uniquely probative' of guilt in a later accusation"].) The remoteness of the incident merely affected the weight the jury might accord to this evidence, an argument defendant was free to make at trial. (See, e.g., *Rufo v. Simpson* (2001) 86 Cal.App.4th 573, 585-587 [evidence of prior abuse was "relevant to motive, intent and identity"].)

Defendant suggests the prejudice of the prior incident was heightened, and the probative value correspondingly lessened, by the fact that there was "no violence in the relationship for an extended period of time." We do not find that contention persuasive under the circumstances of this case. Specifically, a significant portion of that gap occurred because defendant was incarcerated for 13 years. And while there was no evidence of physical violence after defendant resumed his relationship with Sharon in 2004, there was evidence defendant regularly threatened Sharon.

We also reject defendant's contention that the evidence was cumulative, as the prosecution had more recent evidence of "ill will" and disharmony in the marriage. Defendant did not raise that argument before the trial court, and, in any event, the evidence of prior physical violence by defendant was not cumulative of the testimony regarding recent verbal threats. In addition, the court addressed the issues of cumulative evidence and undue consumption of time when it admitted only one of the prior acts of misconduct.[13]

---

[13] Defendant also argues the court's decision to admit the choking incident but exclude the incident with the frying pan that occurred two years earlier was "arbitrary," as both should have been excluded as too remote. This contention lacks support in the record. The court was within its discretion to conclude that a difference of two years in the age of the witness (Escobar) and the remoteness of the incidents warranted the admission of one and exclusion of the other. Indeed, far from being arbitrary, the court explained its reasoning on the record and carefully considered the merits of admitting each incident.

18

Here, defendant did not demonstrate he would be unduly prejudiced by the introduction of the prior uncharged act of domestic violence, or that any potential prejudice would substantially outweigh the probative value of the evidence.  We therefore conclude that the trial court did not abuse its discretion in permitting the People to introduce Escobar's testimony regarding the choking incident.[14]

5.      *No Sua Sponte Duty to Give Limiting Instruction*

Defendant also contends the trial court should have instructed the jury that the evidence could not be used to show defendant had a propensity for violence.  He recognizes defense counsel did not request such an instruction at trial, and that the court ordinarily has no sua sponte duty to instruct the jury as to the admissibility or use of other crimes evidence.  (See *People v. Collie* (1981) 30 Cal.3d 43, 63–64.)  But he cites an "exception" to this rule under *Collie, supra*, 30 Cal.3d at p. 64.  There, the Supreme Court noted in "an occasional extraordinary case in which unprotested evidence of past offenses is a dominant part of the evidence against the accused, and is both highly prejudicial and minimally relevant to any legitimate purpose . . . the evidence might be so obviously important to the case that sua sponte instruction would be needed."  (*Ibid*.)  The court in *Collie* did not find this exception applicable (*ibid*.), and we are similarly unpersuaded, particularly given the brevity of Escobar's testimony on the incident.

6.      *Any Error Was Harmless*

We further conclude that any potential error in admitting the evidence was harmless.  We review a court's erroneous admission of prior misconduct evidence under

---

[14] Defendant also argues Escobar should not have been allowed to testify generally about the nature of the relationship between defendant and Sharon and whether the relationship was abusive.  Defendant did not object to this line of inquiry, either during the pre-trial hearing when the prosecutor requested it or during the examination of Escobar.  As such, he has forfeited his right to challenge the court's ruling on appeal.  (See, e.g., *People v. Partida* (2005) 37 Cal.4th 428, 435 [to preserve issue on appeal, objection must "fairly inform the trial court, as well as the party offering the evidence, of the specific reason or reasons the objecting party believes the evidence should be excluded, so the party offering the evidence can respond appropriately and the court can make a fully informed ruling"].)

19

the standard of *People v. Watson* (1956) 46 Cal.2d 818, 836, requiring reversal only if there is a reasonable probability that the defendant would have obtained a more favorable result absent the error. (See, e.g., *People v. Malone* (1988) 47 Cal.3d 1, 22.)

As discussed above, the testimony by Escobar regarding the choking incident was very brief, consisting of a few lines of testimony during her direct examination, as well as responses to a few questions by defense counsel on cross-examination. She provided little detail other than her statement that defendant attacked and choked Sharon following an argument between them. Escobar's testimony on this issue was also followed, and tempered, by her admission during cross-examination that defendant seemed to have changed for the better following his return in 2004 and that she had not witnessed any physical violence between her parents after that point. Further, neither party mentioned the incident during closing argument.

In contrast, the other evidence supporting the verdict was overwhelming. Defendant admitted killing Sharon and acknowledged she might have been lying on the floor when he shot her. The extensive forensic evidence showed she was shot eight times, requiring eight separate trigger pulls. Sharon was shot once in the back of the head and several times while positioned below the shooter. Bullet holes in the carpet were also consistent with shots fired while Sharon was on the floor. Further, testimony from both of the couple's children established that defendant had repeatedly threatened Sharon within days of the incident, including asking her if she was "ready to die" and stating that he would "pop a cap in her ass" the day before she was shot. Accordingly, it is not reasonably probable defendant would have obtained a more favorable result absent Escobar's testimony.

B.     *Exclusion of Evidence Regarding Substance Abuse*

Defendant argues that the trial court erred in excluding two pieces of evidence: (1) evidence of substance abuse by both defendant and Sharon at the time of the prior choking incident; and (2) evidence of alcohol and marijuana in Sharon's system at the time she was killed. He further contends these errors violated his due process rights and deprived him of a fair trial. Contrary to defendant's claims, the trial court did not exclude

20

the evidence proffered by defendant, but simply restricted his attempts to introduce the evidence through witnesses who could not establish a proper foundation. Accordingly, we find no error.

### 1. *No Error in Ruling Regarding Prior Substance Abuse*

#### a. *Factual Background*

On cross-examination of Escobar, during her discussion of the choking incident that occurred when she was eight years old, defense counsel asked if defendant was "using drugs" during that period of time. Based on Escobar's age and the fact that defendant was not living with her at the time, the court indicated it would sustain the prosecution's speculation objection, "unless there's offer of proof or unless there's some other basis." At sidebar, defense counsel stated that Escobar's half-sister, Barfield, had indicated defendant and Sharon were on drugs during "this period of time," and "maybe [Escobar] does know. It's an offer of proof there is somebody that had said that he was." The prosecutor pointed out "there's no foundation for this particular witness knowing that," and also argued the evidence was irrelevant. The court agreed as to both speculation and relevance and sustained the objection.

#### b. *Trial Court Did Not Abuse Its Discretion*

Defendant argues he was impermissibly restricted in his cross-examination of Escobar regarding "evidence that [defendant] and the victim were abusing alcohol and drugs at the time of the domestic violence." We disagree.

As an initial matter, the trial court did not err in sustaining the People's objection that defense counsel's question lacked foundation and called for speculation from Escobar. The only foundation offered by defense counsel at trial suggested Barfield might have knowledge of drug use by defendant and Sharon around the time of the choking incident. Defense counsel failed, however, to provide any evidentiary basis to suggest that Escobar, the witness on the stand, had any personal knowledge of drug use. Indeed, defense counsel simply argued that "maybe" Escobar knew of such drug use. On appeal, defendant similarly fails to explain how the question posed to Escobar was based on anything other than speculation. (See *People v. Mehserle* (2012) 206 Cal.App.4th

21

1125, 1154 [no error in excluding evidence where "there was an element of speculation in the defense offer of proof"]; *People v. Eid* (1994) 31 Cal.App.4th 114, 126 ["Failure to make an adequate offer of proof precludes consideration of the alleged error on appeal."].) This is particularly true under the circumstances here, where Escobar's young age and the fact that she was not living with defendant at the time made it less likely she would have knowledge of purported substance abuse by her father. We also note the trial court's ruling did not preclude defendant from seeking to introduce this evidence through other means, such as calling Barfield as a witness. Defendant did not do so.

Further, it was not an abuse of discretion for the trial court to exclude the proffered evidence as minimally probative under Evidence Code section 352. (See *People v. Avila* (2006) 38 Cal.4th 491, 577 [abuse of discretion standard for admission or exclusion of evidence].) Defendant did not address the relevance issue below, and is precluded from doing so now. (See *People v. Eid, supra*, 31 Cal.App.4th at p. 126.) In addition, even if we were to consider the relevance arguments defendant raises for the first time on appeal, we would find them unavailing. Defendant argues Escobar's testimony could have provided evidence that "prior quarrels between [defendant and Sharon] were brought on by drug usage." But defendant offers no suggestion Escobar (or even Barfield) could have testified that either defendant or Sharon was under the influence of drugs or alcohol at the time of a prior fight or domestic violence incident, or that such a confrontation was caused by substance abuse. At best, defendant suggested he had evidence (through Barfield) that defendant and Sharon were using drugs in the same time period that Escobar witnessed defendant choke Sharon. Further, while defendant now focuses on evidence of substance use by Sharon, arguing that "evidence of the victim's alcohol and drug abuse [] could have explained why the domestic violence occurred in the first place," the proffered evidence during the trial was only as to *defendant's* past drug use. Defense counsel never sought to introduce evidence of Sharon's alleged prior drug use and therefore cannot complain on appeal that such evidence was absent from the trial.

Accordingly, the trial court did not err in sustaining the prosecution's objection to defense questioning of Escobar regarding defendant's alleged prior substance abuse. Nor

22

did this evidentiary ruling result in any violation of defendant's constitutional rights. (See, e.g., *People v. Abilez* (2007) 41 Cal.4th 472, 503 [discretionary evidentiary ruling did not violate right to present a defense]; *People v. Gurule* (2002) 28 Cal.4th 557, 620 [ordinary rules of evidence generally do not infringe on the right to present a defense; rejecting argument that restricted cross-examination violated rights to confrontation, due process, and a fair trial]; *People v. Cunningham* (2001) 25 Cal.4th 926, 999 [exclusion of defense evidence on a subsidiary point is not a deprivation of due process]).

### 2. *No Error in Exclusion of Toxicology Evidence*

#### a. *Factual Background*

During cross-examination of medical examiner Dr. Chinwah, defense counsel asked if he had performed a toxicology screen on Sharon. The prosecutor objected based on lack of foundation; at sidebar, she explained that the toxicology report was prepared by a toxicologist. The prosecutor also disclosed the toxicology report showed the presence of alcohol (approximately .06 percent), and "trace amounts of marijuana" in Sharon's blood at the time.[15] The prosecutor objected to the relevance of the report as well, and requested an evidentiary hearing pursuant to Evidence Code section 402 (402 hearing).

At the 402 hearing outside the presence of the jury, Dr. Chinwah confirmed he did not perform the toxicology analysis on Sharon. He sent a "specimen" from Sharon to the lab, then received toxicological results in a report that was attached to the autopsy report. Dr. Chinwah signed off on the autopsy report, but had no personal knowledge regarding the toxicological analysis or results.

The court stated it would allow defense counsel to question Dr. Chinwah regarding whether there was a toxicological report and "what his connection to that [report] is." The court further noted defendant could seek to introduce other witnesses to

---

[15] Defense counsel disputed the People's characterization of the amount of marijuana. There is no evidence in the record of the actual amount listed in the toxicology report.

23

establish a foundation for the toxicology report, at which time the court could hold a further evidentiary hearing regarding the People's relevance objection.

When trial resumed, defense counsel elicited testimony from Dr. Chinwah that he had collected samples of blood, urine, and vitreous fluid from Sharon for a toxicological screening and sent those samples to the laboratory. He later received the results of the screening.

At a further sidebar requested by defense counsel to clarify the allowable scope of questioning, the court stated it was just "thinking out loud in anticipation of a 402" hearing regarding relevance. The court then suggested with the small amounts of the substances at issue, "I think we would need an expert" to testify as to what those amounts might mean, including when Sharon likely ingested the substances and "what affect would that have on her demeanor or her . . . aggressiveness." The court suggested defense counsel could seek to call another witness who could establish chain of custody and "lay a business record foundation" for the report and should look into possible expert testimony to support the defense that Sharon "was all over" defendant. But "for the moment," the court would not permit defendant to ask Dr. Chinwah any questions regarding the results of the toxicological analysis.

### b. *No Error in Exclusion for Lack of Foundation*

On appeal, defendant contends the toxicological evidence was relevant and admissible without an expert opinion. He largely ignores, however, the foundational issue that was the basis of the court's exclusion of Dr. Chinwah's testimony on the toxicological results. He suggests, without explanation, that the "toxicology report qualified as a business record." We agree with the trial court that the report could have been admissible with the proper evidentiary foundation, but there is no evidence to suggest that foundation could have been laid by Dr. Chinwah. As such, the trial court properly sustained the People's objection and excluded Dr. Chinwah's testimony.

Here, defendant does not suggest Dr. Chinwah could have offered testimony sufficient to establish the toxicology report as a business record. (See Evidence Code section 1271 ["business record" must have been: (a) made in the "regular course of a

24

business"; (b) made at or near the time of the event; (c) a "qualified witness testifies to its identity and the mode of its preparation"; and (d) the "sources of information and method and time of preparation were such as to indicate its trustworthiness"].) Indeed, based on Dr. Chinwah's testimony that he did not prepare the report and was not involved in its preparation, it is unlikely he could have done so. As such, it was not error for the court to find defendant could not introduce the toxicology report through Dr. Chinwah. (See *People v. Zavala* (2013) 216 Cal.App.4th 242, 245 [court has "wide discretion in determining whether a proper foundation has been laid for admission of business records" as a hearsay exception].)

Further, while the court specifically invited defendant to introduce other witnesses who could properly lay the foundation for the report, defendant did not do so. As such, the court never definitively ruled on the People's relevance objection, and we need not reach defendant's claim that the evidence was improperly excluded on that basis. If we assume the trial court would have sustained the relevance objection, we note that it might have been error for the court to find evidence of alcohol and drugs in Sharon's system inadmissible without testimony by an expert. (See *People v. Wright* (1985) 39 Cal.3d 576, 583 [evidence of heroin in victim's system at time of death relevant to defendant's claim he "acted in self-defense in response to the victim's irrational behavior"].)[16] However, any such error would have been harmless, especially absent expert testimony supporting defendant's theory that Sharon's ingestion of alcohol and marijuana could have caused her to act aggressively. (See *id.* at p. 585 [exclusion of evidence harmless where defendant lacked evidence of the effects of the heroin or the significance of the level found in the victim]; see also *Watson, supra*, 46 Cal.2d at p. 836 [harmless error where not reasonably probable that the jury would have reached a more favorable result

---

[16] The admissibility of the evidence in *Wright* was bolstered by factors not present here, such as its minimal prejudicial effect in light of other testimony regarding the victim's recent drug use and its value in impeaching the key prosecution witness. (*Id.* at pp. 583-584.) The trial court here never weighed the evidence pursuant to Evidence Code section 352, as it deferred that analysis until defendant produced a witness who could overcome the foundational issue.

absent the error].)  Nor was there any other evidence connecting Sharon's use of alcohol or drugs to aggressive behavior; notably, neither Perry, Jr. nor Francillon testified that Sharon appeared impaired when they left shortly before defendant's arrival at the apartment.  Accordingly, the evidence, even if admitted, would have done little to bolster defendant's claim that Sharon attacked him and he shot her in self-defense.

C.      *Jury Instruction Regarding Voluntary Intoxication*

Defendant contends the trial court erred by instructing the jury regarding his intoxication using CALCRIM No. 625.  We disagree.

At defense counsel's request and over the People's objection,[17] the trial court instructed the jury with the standard CALCRIM No. 625 as follows:  "You may consider evidence, if any, of the defendant's voluntary intoxication only in a limited way. You may consider that evidence only in deciding whether the defendant acted with an intent to kill, or the defendant acted with deliberation and premeditation. . . .  You may not consider evidence of voluntary intoxication for any other purpose."

Defendant did not object to the wording of the instruction or request any clarification at trial.  Defendant now claims the instruction was flawed because it advised jurors that they "may" consider evidence concerning intoxication in determining whether he had the requisite mental states, rather than instructing that they **"must"** consider it.

The Attorney General contends defendant's failure to object results in a forfeiture of this claim, as "'[g]enerally, a party may not complain on appeal that an instruction correct in law and responsive to the evidence was too general or incomplete unless the party has requested appropriate clarifying or amplifying language.' [Citations.]" (*People v. Catlin* (2001) 26 Cal.4th 81, 149.)  However, because defendant argues that the instruction was legally incorrect, we will proceed to the merits of his claim.

On the merits, we are not persuaded that the court erred by giving the standard instruction here.  On a reading of CALCRIM No. 625 as a whole, the use of "may" as opposed to "shall" or "must" in the instruction does not reasonably suggest jurors are free

_____

[17] The prosecutor argued there was insufficient evidence of defendant's intoxification to justify giving the instruction.  The court overruled that objection.

26

to decide whether they want to consider the evidence of voluntary intoxication. (See, e.g., *People v. Ledesma* (1997) 16 Cal.4th 90, 95 [noting that "the 'shall'/'may' dichotomy . . . is not a fixed rule of statutory construction. [Citations.] Moreover, unlike some codes that expressly define 'shall' as mandatory and 'may' as permissive [citations], the Penal Code provides only that '[w]ords and phrases must be construed according to the context and the approved usage of the language . . . .' (§ 7, subd. 16.)."].) In the context of the entire instruction, the use of "may" together with "only" conveys a restricted permission or authorization, instructing the jurors that they are permitted to consider the evidence of intoxication only for the specific purpose of deciding whether defendant possessed the requisite mental state and for no other purpose.

Further, the court expressly instructed the jurors that in determining whether the prosecution proved its case beyond a reasonable doubt, they "must" consider all of the evidence (see CALCRIM No. 220), and that they should consider any statements made by defendant before the trial "along with all the other evidence," in reaching a verdict (see CALCRIM No. 358). Moreover, the instruction itself expressly called the jury's attention to the evidence and the issues to which it was relevant. (See *People v. Castillo* (1997) 16 Cal.4th 1009, 1017.) Considering the instructions as a whole, as we must (see, e.g., *People v. Campos* (2007) 156 Cal.App.4th 1228, 1237), the trial court adequately informed the jury that it should consider evidence of defendant's voluntary intoxication for the limited purposes described. We presume that the "jurors are intelligent persons and capable of understanding and correlating all jury instructions which are given.' [Citation.]" (*People v. Romo* (1975) 47 Cal.App.3d 976, 990-991, disapproved on other grounds in *People v. Anderson* (1987) 43 Cal.3d 1104, 1122, see also *People v. Laskiewicz* (1986) 176 Cal.App.3d 1254, 1258 ["Instructions should be interpreted, if possible, so as to support the judgment rather than defeat it if they are reasonably susceptible to such interpretation."].)

Defendant's due process challenge turns on "'whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way' that violates the Constitution. [Citation.]" (See, e.g., *Estelle v. McGuire* (1991) 502 U.S. 62, 72.) Under

27

the circumstances, we find no reasonable likelihood jurors misunderstood the instruction to permit them to improperly ignore the evidence of voluntary intoxication.

Defendant's reliance on *People v. Stevenson* (1978) 79 Cal.App.3d 976, in which the court considered a defense of diminished capacity, is misplaced. There, the reviewing court concluded the trial court had erroneously limited consideration of evidence of voluntary intoxication to defendant's generalized mental state rather than as it bore upon specific intent to commit the charged crimes. (*Id*. at p. 987.) In dicta addressing a possible retrial, the court also noted former CALJIC No. 3.35[18] was the "proper instruction" regarding voluntary intoxication, rather than CALJIC No. 4.21, as the former instruction advised jurors they "must" consider evidence of intoxication, while the latter stated they "should" do so. (*Id*. at p. 987.) The *Stevenson* court did not provide any further analysis of the issue, nor did it analyze or involve a limiting instruction similar to CALCRIM No. 625.[19] Accordingly, the *Stevenson* dicta does not convince us that CALCRIM No. 625 is flawed or inadequate. (See *People v. Yoder* (1979) 100 Cal.App.3d 333, 339 [construing comments in *Stevenson* "simply as advice to the lower court as to the framing of appropriate instructions in the event of retrial of that case rather than as a general condemnation of CALJIC 4.21 in favor of 3.35 in all cases"].)

---

[18] Former CALJIC No. 3.35 states: "When a defendant is charged with a crime which requires that a certain specific intent or mental state be established in order to constitute the crime or degree of crime, you must take all the evidence into consideration and determine therefrom if, at the time when the crime allegedly was committed, the defendant was suffering from some abnormal mental or physical condition, however caused, which prevented him from forming the specific intent or mental state essential to constitute the crime or degree of crime with which he is charged. [¶] If from all the evidence you have a reasonable doubt whether defendant was capable of forming such specific intent or mental state, you must give defendant the benefit of that doubt and find that he did not have such specific intent or mental state."

The Legislature subsequently abolished the defense of diminished capacity as of January 1, 1982. (See *People v. Pensinger* (1991) 52 Cal.3d 1210, 1241 & fn. 5.)

[19] We also note the error in *Stevenson* was compounded by the giving of former CALJIC No. 3.34, which "tells the jury that they must assume that the defendant was of sound mind at the time of his alleged conduct," and therefore contradicts former 3.35. (*Stevenson, supra*, 79 Cal.App.3d at p. 984.) No such conflicting instructions were present here.

28

D.      *Prosecutorial Misconduct*

Defendant contends several instances of improper conduct by the prosecutor deprived him of a fair trial.  We find these claims were forfeited by defendant's failure to object at trial.  Moreover, on the merits, we conclude no misconduct occurred.

1.      *Alleged Instances of Misconduct*

a.      Facts Regarding Age of Prior Domestic Violence Incident

Defendant contends that when seeking the introduction of his prior acts of domestic violence, the prosecutor "gave vague and misleading answers" regarding the ages of the witnesses and the dates of the prior incidents.

After defense counsel objected to the remoteness of the prior misconduct, indicating that they occurred "at least" 20 to 25 years ago, the court asked how old the witnesses were now.  The prosecutor responded that all three children (Barfield, Perry, Jr. and Escobar) were "adults" in their "twenties and thirties."  In actuality, Perry, Jr. was 31 years old and Escobar was 33 years old at the time of trial.  Barfield's exact age was never disclosed, but she was the eldest child.

The court also asked about the ages of the prior incidents.  The prosecutor indicated the choking incident occurred when Escobar was about eight or ten years old, "probably 20 years" ago.  The frying pan incident occurred when Escobar was six years old, about 22 years ago.  In fact, assuming the choking incident occurred when Escobar was eight years old, it took place about 23 years prior to the charged offense.

b.      Defendant's Statement Regarding Prior Jail Time

On motion by defendant, the court bifurcated the trial on his prior strike convictions.  Defendant now contends the prosecution violated the court's bifurcation order by introducing evidence of his prior convictions.

During the People's case in chief, the prosecutor played portions of the video from defendant's interview with the LAPD and provided copies of the interview transcript to the jury.  After about thirty seconds, the prosecutor paused the video and began asking the witness (Detective Lait) to identify the people shown.  Defense counsel asked to approach and stated she had "just realized . . . we never agreed about Mr. Perry saying

29

that he has two strikes in this transcript and we -- he doesn't." During the interview,[20] defendant stated he had "been in and out of jail," he "went in in '94," and "got out last time in like 2004." He also stated twice that Sharon and Perry, Jr. knew "I got two strikes" and that for the past seven years he had "been clean" and "really wanted to turn my life around."

While still at sidebar, the court asked defense counsel how she would like to handle the issue, and defense counsel suggested "after it's played," the court could inform the jury defendant's statement about having two strikes was "incorrect." The court then suggested telling the jury "the defendant misstates his own criminal record," and the prosecutor proposed in the alternative that "the court could say there's no evidence that he has two strikes, this is not a third strike case." Both the court and defense counsel stated they preferred the prosecutor's suggestion. The prosecutor then resumed playing the video. After it was over and before the next break, the court told the jury "you may remember from the airing of the interview as well as the transcript that the defendant mentions that he has two strikes. I want to . . . tell the jury that there is no evidence that he has two strikes and that this is not a three strikes case."

c.      Argument Regarding Intoxication Defense

Toward the end of her closing argument, the prosecutor made the following statement while discussing murder, which defendant contends was a prejudicial misstatement of the law: "intoxication is not a defense here either because in order to be a defense it has to actually prevent the defendant from deliberating, from premeditating. . . . It has to actually stop the defendant from forming that intent to kill. It's not a defense. It's never a defense by the way to second degree murder, but it's not a defense to first

---

[20] It is not clear from the record whether any of defendant's statements regarding his prior convictions had been played on the video when defense counsel raised her objection. Defendant claims on appeal that defense counsel made her objection because she "heard [defendant] mention his prior strikes while the tape was being played to the jury." There is no evidence to support this contention, and it is inconsistent with some of the ensuing discussion between the court and counsel. However, the jury had been provided with copies of the transcript at this point.

30

degree murder here. And that is because the defendant made a series of conscious decisions before, during and after the crime that tells us . . . that his judgment was not clouded by whatever amount of alcohol he had to drink." Defense counsel did not object.

When defense counsel began her closing, she countered by stating that "counsel just told you that voluntary intoxication is not a defense and that is not correct. As you see . . . [CALCRIM] No. 625, it is a defense. It is a defense in order to negate intent to kill. It does reduce a murder down to a manslaughter. It's a jury instruction." The following exchange then occurred:

"[PEOPLE]: Your honor, I have to object. That misstates the law. It's not a defense to second degree. It only potentially could negate the specific intent for first degree or the premeditation and deliberation for first to bring it down to a second.

"COURT: Sustained. Folks, that was an awful lot by the D.A., but again, I'll sustain that. But please, if you believe it's some conflict between what the lawyers say and what my instructions say, you're required to follow what my instructions say. . . .

"[DEFENSE]: All right. Let me clarify, actually. I'll read it to you so it is very clear: [Reads CALCRIM No. 625] So it can reduce a first degree murder down to manslaughter.

"[PEOPLE]: Objection. . . . That's not the law. I have to--

"COURT: Sustained. And if we have to go sidebar to clarify that, I'm happy to do that. . . . [¶] If there's some clarification the court may thereafter give, do alert the court."

Defense counsel then moved on to another point.

### d.    Argument Regarding Heat of Passion

Defendant contends the prosecutor also misstated the applicable law regarding heat of passion in her discussion of voluntary manslaughter during her closing argument. Defendant cites the following statement:

31

"[T]he reason that manslaughter exists in the law is because sometimes people actually make a decision to kill, but *there's a reason behind that decision* that mitigates the crime in a way to reduce it from murder to manslaughter. For example, one form of manslaughter . . . is known as heat of passion. The . . . textbook example probably is when somebody comes home and finds their spouse in bed with another person and is so overcome by rage or whatever emotion, . . . and that emotion blinds the person, and in blinding that person *it totally obscures their reasoning*. That's heat of passion. That is not this case. . . . And the heat of passion category of voluntary manslaughter not only requires that the defendant act . . . under the influence, if you will, of that rage *that an ordinary person in the same circumstances would act in the same manner*. Nothing that Sharon did would cause an ordinary reasonable person, such as yourselves, to have been overcome by an uncontrollable emotion or mix of emotions that *would have blinded the person to the point that they could not reason*." [Emphasis added.]

e.        Appeal to Jury's Sympathies

Finally, defendant contends the prosecutor committed misconduct in her rebuttal closing argument. After arguing defendant was a "story teller" who "writes fiction" not based "in physical evidence," the prosecutor stated "in the story that the defendant has told you in the story that he continues to want you to believe, he will walk away from all of this and he will walk away a free man, in his version, in his fictional account." She noted defendant's reference to Sharon as "his first wife," and continued:

"Her body hadn't even been moved yet and he had already closed that chapter of his life. His first wife. Let us not forget Sharon's story. She was not just a wife to this man, she was a mother, she was a grandmother, she was a cousin, an aunt, a friend, a human being above all who did not have to die this way. . . . [¶] Let's finish her story for her. You as jurors can give the end of her story a true and accurate rendering that is based in fact and reality and not fiction. . . . Nobody deserves to die that way. And

32

Sharon did not deserve that end.  This--this is how Sharon's life ended, but her story isn't over yet.  You have the power to write that last chapter for her.  That is what I'm asking you to do."

2. *Legal Principles*

"The standards governing review of misconduct claims are settled.  ʻA prosecutor who uses deceptive or reprehensible methods to persuade the jury commits misconduct, and such actions require reversal under the federal Constitution when they infect the trial with such "ʻunfairness as to make the resulting conviction a denial of due process.ʼ" (*Darden v. Wainwright* (1986) 477 U.S. 168, 181; see *People v. Cash* (2002) 28 Cal.4th 703, 733.)ʼ" (*People v. Williams* (2013) 56 Cal.4th 630, 671.)  Regarding the scope of permissible prosecutorial argument, "ʻ"a prosecutor is given wide latitude during argument. The argument may be vigorous as long as it amounts to fair comment on the evidence, which can include reasonable inferences, or deductions to be drawn therefrom. [Citations.]"ʼ" (*People v. Stanley* (2006) 39 Cal.4th 913, 951.)

3. *Misconduct Claims are Forfeited*

As an initial matter, the Attorney General contends these claims are forfeited, as defense counsel failed to object at trial to virtually all of the conduct defendant now challenges. We agree.  "ʻIn order to preserve a claim of misconduct, a defendant must make a timely objection and request an admonition; only if an admonition would not have cured the harm is the claim of misconduct preserved for review.ʼ [Citation.]" (*People v. Williams, supra*, 56 Cal.4th at p. 671.)  Because a timely objection and admonition could have cured any misconduct alleged, defendant may not raise these objections for the first time on appeal.  To the extent defendant claims he did object, or that his objection would have been futile, we disagree and address those issues further below.

Defendant attempts to avoid forfeiture by arguing the failure to object constituted ineffective assistance of counsel.  We note that a decision to raise or forgo an objection during the heat of trial is generally a matter of trial tactics and we will not "attempt to second-guess trial counsel" except in rare cases.  (*People v. Frierson* (1979) 25 Cal.3d

33

142, 158.) "Attorneys are not required to make every conceivable objection. Litigation is a series of tactical choices about which there are no absolute rules." (*People v. Anzalone* (2006) 141 Cal.App.4th 380, 394–395.) Here, we cannot say there could have been no tactical reason not to highlight the statements (or to believe the statement did not constitute misconduct). We therefore reject the contention that trial counsel was ineffective on this basis. In any event, as detailed below, we find no misconduct occurred.

### 4. *Analysis of Misconduct Claims*

#### a. No Misrepresentation of Facts Related to the Prior Domestic Violence Incident

Defendant claims the prosecutor deceived the court regarding certain facts of the prior domestic violence incidents she was seeking to introduce into evidence. Specifically, defendant claims the prosecutor was misleading in responding to the court's questions about the current age of the witnesses (Sharon's children) and the age of the incidents. Because the prosecutor made no material misstatements and the record lacks any indication she intended to mislead the court, we conclude no misconduct occurred.

We are not persuaded the prosecutor's statements to the court that Sharon's children were in their "twenties and thirties," when they were all over thirty, and that the choking incident witnessed by Escobar occurred "probably" 20 years ago, rather than approximately 23 years ago, reflected an attempt to deceive the court into admitting the evidence. While the prosecutor's age estimates were slightly inaccurate, they were far from being materially misleading. Moreover, there is no indication the court was misled. Both parties supplied the court with the information crucial to its analysis of the admissibility of the prior conduct—that the witnesses, now adults, had observed the conduct as young children and that the prior misconduct was at least 20 to 25 years old. Defense counsel also correctly informed the court that the witnesses were currently all in their thirties. Further, defense counsel objected and argued at length regarding the remoteness of the prior incidents and the court expressed its concern over the same issue, excluding the older of the two incidents because of remoteness combined with the youth

34

of the witness.  Thus, there is no risk, under the circumstances, that the court was somehow misled into believing that the choking incident was not remote.  Nor is there any evidence in the record from which we could infer that the prosecutor was intentionally deceptive.  Accordingly, we find no misconduct.

b.  No Misconduct Regarding Evidence of Prior Jail Time

Defendant contends the prosecutor committed misconduct and violated the trial court's order bifurcating trial on defendant's prior convictions by introducing defendant's unredacted interview, including his statements referring to prior jail time and "two strikes."

Defendant relies on *People v. Figuieredo* (1955) 130 Cal.App.2d 498 in support of this claim.  There, the prosecutor assured the defendant that if he admitted his prior felony convictions before trial and did not testify, "the jury will never know anything about your priors."  (*Id*. at p. 505.)  The prosecutor then elicited two statements from the investigating police officer that defendant had "serv[ed] time in San Quentin."  (*Id*. at p. 506.)  The court denied defense counsel's motion to strike.  (*Ibid*.)  The court of appeal concluded that "[i]n view of the context of the questions and answers on direct examination of the officer . . . it is reasonable to assume that the deputy district attorney knew that the conversation" would reveal defendant's prior prison time.  Moreover, "[i]n view of the assurance" given to defendant by the prosecutor, "the questions by the deputy [district attorney] under circumstances which would permit references to serving time in San Quentin constituted prejudicial misconduct."  (*Ibid*.)

We find *Figuieredo* distinguishable.  Here, there is no indication the prosecutor intentionally elicited defendant's statements regarding his prior jail time.  The information was not elicited from a live witness at trial as the result of questioning by the prosecutor.  Rather, defendant's statements were dispersed over the course of two consecutive paragraphs of a thirty-five page transcript of a previously-recorded interview. Defense counsel admitted the parties had not discussed the issue prior to trial, nor is there any other evidence suggesting that the prosecutor engaged in deceptive conduct in an attempt to mislead the jury or to deny defendant a fair trial.  While defendant is correct

35

that we may find misconduct even in the absence of "bad faith or wrongful intent" (*People v. Crew* (2003) 31 Cal.4th 822, 839), the other cases he cites do not persuade us that misconduct occurred under the circumstances here. (See *People v. Warren* (1988) 45 Cal.3d 471, 481 [failure to admonish witnesses]; *People v. Leonard* (2007) 40 Cal.4th 1370, 1405 [finding no misconduct where prosecutor's question "was not inherently likely to elicit a reference to the [inadmissible evidence] and there was no evidence that the prosecutor asked it with the intent to elicit such a reference"].)

Defendant also contends the trial court was ineffective at remedying any prejudice that may have stemmed from defendant's statements. We disagree. The trial court solicited suggestions from both counsel on how to proceed after defense counsel's objection, and both the court and defense counsel approved the admonition proposed by the prosecutor. The court gave that admonition immediately following the conclusion of the video of defendant's interview. Moreover, while defendant now complains about the introduction of all of his statements regarding prior strikes and jail time, at trial defense counsel's objection was limited to her concern that defendant had stated he had two strikes when in fact he did not. Defendant did not request any curative admonition to the jury related to the broader issue of his prior jail time, did not seek to strike those statements from the transcript of the interview (or, indeed, from the video, if the jury had not yet heard the offending portion), or propose any other alternatives. Having approved the admonition given by the court and failed to otherwise object, defendant accordingly has forfeited any claim of error stemming from the court's curative efforts. Nor do we agree with defendant that it would have been impossible to cure the jury's exposure to his statements regarding his prior jail time, particularly as the case against defendant here was strong, as discussed above. (See, e.g., *People v. Felix* (1993) 14 Cal.App.4th 997, 1007–1009 [mention of prior conviction warranted reversal where evidence of guilt was weak and prosecutor "directly urged the jury to use the prior conviction against [defendant ]"]; *People v. Ozuna* (1963) 213 Cal.App.2d 338, 339, 341–342 [statement that defendant was an "ex-convict" incurable by admonition when it resulted from "calculated" misconduct and close evidence resulted in hung jury in first trial].)

36

### c.      Statement Regarding Intoxication

Defendant argues that the prosecutor committed misconduct by telling the jury intoxication is "never a defense . . . to second degree murder." He contends this statement improperly precluded the jury from considering whether "intoxication could negate the intent required for murder and reduce the offense to manslaughter." We conclude that to the extent the prosecutor's statements were unclear or inaccurate regarding the applicability of intoxication, no prejudicial error occurred.

Preliminarily, we must further address forfeiture, as defendant claims he adequately preserved this issue for appeal. While defense counsel did not object to the prosecutor's statements during her closing argument, defendant contends any objection would have been futile given the trial court's subsequent "agreement with the prosecutor's misstatement of law." We disagree. First, the trial court did not rule on the issue until the prosecutor objected to defense counsel's closing argument; defense counsel did not object or seek any curative instruction to the prosecutor's purported misstatement, as is required to present the issue on appeal. Second, although the court did sustain the prosecutor's objections, it also expressly invited defense counsel to seek further clarification or make further argument at sidebar. As such, it would not have been futile for defendant to request curative instructions from the court.

Further, we conclude defendant's claim fails on the merits. A brief background on the basic concepts related to murder and manslaughter may be helpful here. "California statutes have long separated criminal homicide into two classes, the greater offense of murder and the lesser included offense of manslaughter." (*People v. Rios* (2000) 23 Cal.4th 450, 460.) The elements of murder are an unlawful killing of a human being committed with malice aforethought. (§ 187, subd. (a).) Malice may be express or implied. (§ 188.) "Intent unlawfully to kill" and express malice are, in essence, "one and the same." (*People v. Saille* (1991) 54 Cal.3d 1103, 1114.) Malice is implied "when a killing results from an intentional act, the natural consequences of which are dangerous to human life, and the act is deliberately performed with knowledge of the danger to, and with conscious disregard for, human life." (*People v. Cook* (2006) 39 Cal.4th 566, 596.)

37

In the context of a murder charge, evidence of voluntary intoxication "is admissible solely on the issue of . . . whether the defendant premeditated, deliberated, or harbored express malice aforethought." (§ 29.4; see, e.g., *People v. Martin* (2000) 78 Cal.App.4th 1107, 1114.) Thus, voluntary intoxication is inadmissible to negate implied malice. (*People v. Martin, supra*, 78 Cal.App.4th at p. 1114.)

Manslaughter is an unlawful killing without malice. (§ 192; *People v. Thomas* (2012) 53 Cal.4th 771, 813.) Two factors may preclude the formation of malice and reduce murder to voluntary manslaughter: heat of passion and unreasonable self-defense. (*People v. Beltran* (2013) 56 Cal.4th 935, 942, 951 (*Beltran*); *People v. Blakeley* (2000) 23 Cal.4th 82, 87–88.) "Thus, where the defendant killed intentionally and unlawfully, evidence of heat of passion, or of an actual, though unreasonable, belief in the need for self-defense, is relevant only to determine whether malice has been established, thus allowing a conviction of murder, or has not been established, thus precluding a murder conviction and limiting the crime to the lesser included offense of voluntary manslaughter." (*People v. Rios, supra,* 23 Cal.4th at p. 461.)

According to defendant, the prosecutor's suggestion that intoxication could not be considered to reduce a charge from second degree murder to manslaughter was improper in two ways. If the jury believed there was no premeditation (thus eliminating the option of conviction for first degree murder), it could consider intoxication to determine whether defendant had the express malice necessary to convict him of second degree murder. Second, the jury could consider whether intoxication was relevant to defendant's claim of imperfect self-defense.

From the context of the prosecutor's argument and the colloquy between the parties and the court, it is apparent the prosecutor was focused on a charge of *implied* malice second degree murder, and she was therefore correct that intoxication would be inadmissible to negate implied malice and reduce the charge from second degree murder to manslaughter. However, this was not clearly articulated before the jury and the prosecutor's statement that intoxication could "never" be a defense to second degree murder was unclear and therefore potentially confusing. And, as defendant points out,

38

we need not find that the prosecutor intentionally misstated the law in order to conclude that misconduct occurred.

We conclude, however, that any misstatement by the prosecutor did not result in prejudice to defendant.  In particular, immediately following the dispute on this issue, the court emphasized to the jury that they were required to follow the instructions they were given and to defer to the instructions in the event of a conflict with argument by counsel (an admonition that was repeated when the jury was instructed with CALCRIM No. 200). In defense counsel's closing argument, she read the intoxication instruction, CALCRIM No. 625, to the jury as the applicable law to follow.

Moreover, the jury was adequately and properly instructed regarding the law on murder, manslaughter, and the applicability of evidence of intoxication.  As noted, the jury was instructed with CALCRIM No. 625, which properly advised them that they were to consider evidence of defendant's intoxication "in deciding whether defendant acted with an intent to kill."  The court also instructed the jury as to second-degree murder with CALCRIM No. 520, including the requirements for express and implied malice, and as to voluntary manslaughter based on imperfect self-defense with CALCRIM No. 571.  We presume the jurors understood and followed these instructions (see *People v. Hinton* (2006) 37 Cal.4th 839, 871), and properly considered defendant's statement that he was intoxicated in determining whether he possessed the malice required for murder.

We also reject defendant's contention that the prosecutor's statements regarding intoxication left the jury with the impression they could not consider that issue as relevant to defendant's claim of imperfect self-defense.  To some extent, the jury's consideration of intoxication as relevant to malice would overlap with the question of whether defendant acted in imperfect self-defense.  (See *Beltran, supra,* 56 Cal.4th at p. 951 ["[I]mperfect self-defense 'obviates malice because that most culpable of mental states "cannot coexist" with an actual belief that the lethal act was necessary to avoid one's own death or serious injury at the victim's hand.'  [Citation.]"]; *People v. Moye* (2009) 47 Cal.4th 537, 549 [heat of passion and imperfect self-defense are "'theories of partial exculpation' that reduce murder to manslaughter by negating the element of malice.

39

[Citation.]"].) More importantly, the imperfect self-defense instructions explicitly told the jury to consider all the circumstances from the defendant's perspective when determining defendant's subjective beliefs, stating: "In evaluating the defendant's beliefs, consider all the circumstances as they were known and appeared to the defendant." (CALCRIM No. 571.) Given this directive, the jury likely understood it could consider intoxication (to the extent it believed defendant's statement to that effect) as relevant to defendant's subjective state of mind to establish imperfect self-defense.

In sum, we are satisfied from the record as a whole that the jurors understood they were required to consider intoxication as applicable to defendant's formation of express malice for murder, and when evaluating defendant's state of mind for purposes of imperfect self-defense.

### d. Statement Regarding Heat of Passion

Defendant also contends the prosecutor misstated the law regarding heat of passion in her closing argument, thereby committing misconduct. As discussed above, defendant has forfeited this claim by failing to object below. Moreover, even if we were to consider the merits, we would conclude no prejudicial misconduct occurred.

Defendant points to two aspects of the legal requirements for invoking the heat of passion defense that he claims the prosecutor misstated. First, the prosecutor told the jury that heat of passion required a person to become overcome with emotion "to the point that they could not reason," or that reason would become "totally obscure[d]." Defendant now contends adequate provocation does not require a defendant to "entirely lose his capacity to reason." Second, the prosecutor argued the jury should consider whether "an ordinary person in the same circumstances would act in the same manner." This statement, defendant argues, incorrectly suggested that provocation is adequate only if an ordinary person of average disposition would *kill* in response to it. Defendant relies on *Beltran, supra,* 56 Cal.4th 935 for both contentions.

In *Beltran*, the California Supreme Court held that the proper standard to be applied in deciding whether provocation is legally sufficient to constitute heat of passion is not whether an ordinary person of average disposition would kill under the same

40

circumstances, but whether an ordinary person of average disposition under those circumstances would act rashly and without due deliberation or reflection and from passion rather than judgment. (*Beltran, supra*, 56 Cal.4th at p. 942, citing *People v. Barton* (1995) 12 Cal.4th 186.) As the *Beltran* court explained: "Adopting a standard requiring such provocation that the ordinary person of average disposition would be moved to kill focuses on the wrong thing. The proper focus is placed on the defendant's state of mind, not on his particular act. To be adequate, the provocation must be one that would cause an emotion so intense that an ordinary person would simply react, without reflection. . . . Framed another way, provocation is not evaluated by whether the average person would *act* in a certain way: to kill. Instead, the question is whether the average person would *react* in a certain way: with his reason and judgment obscured." (*Beltran, supra*, 56 Cal.4th at p. 949.)

The Attorney General does not address defendant's first asserted *Beltran* error and concedes the second. While we are not convinced the statements by the prosecutor here were clearly in violation of *Beltran*, it is certainly possible that they "muddied the waters" with respect to the requirements for heat of passion. (*Beltran, supra*, 56 Cal.4th at p. 954.)

However, even assuming error, we conclude the potential ambiguity in the prosecutor's closing argument did not prejudice defendant because he has not shown, and cannot demonstrate, "'a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion.' [Citations.]" (*People v. Cole* (2004) 33 Cal.4th 1158, 1202-1203.) Crucially, the court instructed the jury with the proper standard as set forth in CALCRIM No. 570, which states: "In deciding whether the provocation was sufficient, consider whether a person of average disposition, in the same situation and knowing the same facts, would have reacted from passion rather than from judgment." The *Beltran* court expressly approved this formulation. (*Beltran, supra*, 56 Cal.4th at p. 954 ["Telling the jury to consider how a person of average disposition "would [have] react[ed]" properly draws the jury's attention to the objective nature of the standard and the effect the provocation would have on such a person's state

of mind."].)  The court also instructed the jury under CALCRIM No. 200 that it would "now instruct . . . on the law that applies to this case," that each juror "has a copy of [the] instructions to use in the jury room," that the jury "must follow the law as I explain it to you," and that "[i]f you believe that the attorneys' comments on the law conflict with my instructions, you must follow my instructions."

As noted above, we presume on appeal the jurors understood and followed the trial court's instructions.  (*People v. Hinton, supra,* 37 Cal.4th at p. 871.)  We also note defendant's argument to reduce the killing to manslaughter focused on imperfect self-defense, not heat of passion.  Accordingly, we find no prejudice resulting from the purported misconduct.

> e.    No Misconduct During Prosecutor's Closing Rebuttal

Finally, defendant contends the prosecutor violated the "Golden Rule" by appealing to the passion and prejudice of the jury during her rebuttal argument.  We disagree.

The rules are well settled:  "'[A] prosecutor is given wide latitude during argument.  The argument may be vigorous as long as it amounts to fair comment on the evidence, which can include reasonable inferences, or deductions to be drawn therefrom.  [Citations.]  It is also clear that counsel during summation may state matters not in evidence, but which are common knowledge or are illustrations drawn from common experience, history or literature."  [Citation.]  "A prosecutor may 'vigorously argue his case and is not limited to "Chesterfieldian politeness"' [citation] . . .'"  (*People v. Ward* (2005) 36 Cal.4th 186, 215) and he may "use appropriate epithets. . . ."  (*People v. Wharton* (1991) 53 Cal.3d 522, 567.)  However, a prosecutor may not make statements that appeal to the passions and prejudices of the jury.  "'[A]n appeal for sympathy for the victim is out of place during an objective determination of guilt.'"  (*People v. Kipp* (2001) 26 Cal.4th 1100, 1130.)

Here, viewing the totality of the prosecutor's closing remarks, we are unpersuaded that she crossed the line into violating the Golden Rule.  Her invitation to jurors to "write the last chapter" of Sharon's story was part of the broader theme in comparing

42

defendant's version of events as "fiction" to the prosecution's version in which defendant murdered his wife, which she characterized as "a true and accurate rendering that is based in fact and reality." This argument more closely resembled a plea for the jury to "finish the story" by applying the facts and returning a conviction than a request for the jury to place themselves in the victim's shoes. Similarly, the prosecutor's brief reference to Sharon as "mother, . . . a grandmother, a cousin . . ." appears to have been a response to defendant's reference to Sharon during his LAPD interview as his "first wife," rather than an attempt to invoke the jury's sympathy for the victim and her family. We do not find these facts rise to the level of misconduct to invite "an irrational, purely subjective response" by the jury. (*People v. Lewis* (1990) 50 Cal.3d 262, 284; see also, e.g., *People v. Pensinger, supra,* 52 Cal.3d at p. 1250 [argument urging the jury to imagine the crime had happened to their own child held an improper appeal to the passion and prejudice of the jury]; *People v. Seumanu* (2015) 61 Cal.4th 1293, 1344, reh'g denied (Oct. 14, 2015) [harmless error where prosecutor made several comments to jury to "[i]magine begging for your life"]; *People v. Vance* (2010) 188 Cal.App.4th 1182, 1194 [misconduct by telling jury "to literally relive in your mind's eye and in your feelings what [the victim] experienced the night he was murdered"].)

In addition, even if the remarks were error, we would not conclude they prejudiced defendant, given the strong evidence of his guilt and the instructions to the jury to treat counsel's statements as argument, rather than evidence. (See *People v. Leonard, supra*, at p. 1407; *Boyde v. California* (1990) 494 U.S. 370, 384 [arguments of counsel "generally carry less weight with a jury than do instructions from the court. The former are usually billed in advance to the jury as matters of argument, not evidence [citation], and are likely viewed as the statements of advocates; the latter, we have often recognized, are viewed as definitive and binding statements of the law"]; *People v. Mayfield* (1993) 5 Cal.4th 142, 179 [the "court's instructions, not the prosecution's argument, are determinative, for '[w]e presume that jurors treat the court's instructions as a statement of the law by a judge, and the prosecutor's comments as words spoken by an advocate in an attempt to persuade.' [Citation.]"].)

We also reject defendant's argument that he did not forfeit this issue by failing to object because the jury would have been unable to follow a curative admonition. Instead, absent some indication to the contrary, we assume a jury will abide by a trial court's admonitions and instructions. (*People v. Stitely* (2005) 35 Cal.4th 514, 559.) "One of the primary purposes of admonition at the beginning of an improper course of argument is to avoid repetition of the remarks" (*Sabella v. Southern Pac. Co.*(1969) 70 Cal.2d 311, 320), and "'forestall the accumulation of prejudice by repeating improprieties.' [Citation.]" (*People v. Brown* (2003) 31 Cal.4th 518, 553.) Here, had defense counsel objected, the court could have immediately addressed the prosecutor's purportedly improper remarks and determined whether any curative action was necessary. (See, e.g., *People v. Price* (1991) 1 Cal.4th 324, 454-455; *People v. Green* (1980) 27 Cal.3d 1, 29.)[21]

### E.  *Ineffective Assistance of Counsel*

Defendant contends his trial counsel rendered ineffective assistance and denied him due process in several ways. We disagree.

### 1.  *Legal Principles*

"A criminal defendant's federal and state constitutional rights to counsel (U.S. Const., 6th Amend.; Cal. Const., art. I, § 15) include the right to effective legal assistance. When challenging a conviction on grounds of ineffective assistance, the defendant must demonstrate counsel's inadequacy. To satisfy this burden, the defendant must first show counsel's performance was deficient, in that it fell below an objective standard of reasonableness under prevailing professional norms. Second, the defendant must show resulting prejudice, i.e., a reasonable probability that, but for counsel's deficient performance, the outcome of the proceeding would have been different. When examining an ineffective assistance claim, a reviewing court defers to counsel's reasonable tactical decisions, and there is a presumption counsel acted within the wide

---

[21] For the reasons detailed herein, we also reject defendant's contention that prosecutorial misconduct so infected the trial that it violated his due process rights and that the cumulative error was prejudicial.

range of reasonable professional assistance. It is particularly difficult to prevail on an appellate claim of ineffective assistance. On direct appeal, a conviction will be reversed for ineffective assistance only if (1) the record affirmatively discloses counsel had no rational tactical purpose for the challenged act or omission, (2) counsel was asked for a reason and failed to provide one, or (3) there simply could be no satisfactory explanation. All other claims of ineffective assistance are more appropriately resolved in a habeas corpus proceeding. [Citations.]" (*People v. Mai* (2013) 57 Cal.4th 986, 1009.)

"Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. [Citation.] A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.' [Citation.]" (*Strickland v. Washington* (1984) 466 U.S. 668, 689.)

### 2. *Defendant's Trial Counsel Was Not Ineffective*

Defendant raises four areas in which he claims his counsel's representation was defective: (1) with respect to the admission of the prior act of domestic violence, she failed to correct the prosecutor's misstatements regarding the ages of the witnesses and the remoteness of the priors, and failed to adequately review the case law to argue against admission of the incident; (2) she failed to obtain and present evidence, including a toxicologist, to properly support introduction of the toxicology report or other evidence showing that Sharon had marijuana and alcohol in her system at the time of her death; (3) she failed to seek redaction of the mention of defendant's prior jail time from his interview played by the prosecutor at trial, and then failed to request a proper curative

45

admonition by the court; and (4) she failed to object to the prosecutor's misconduct during the People's closing argument.

Defendant has failed to demonstrate his counsel's performance was deficient with respect to any of the challenges raised. First, with respect to the admission of the choking incident, defense counsel argued at length against the admission of defendant's prior acts of misconduct and repeatedly brought the issue of remoteness to the court's attention as a cause for concern. As a result, only one of the prior acts was admitted and the prosecutor withdrew her attempt to admit it to show propensity under Evidence Code 1109. Further, as discussed above, while defense counsel did not object to any inaccuracies in the prosecutor's statements regarding age, she did correctly inform the court that the witnesses were now in their thirties and that the prior incidents were between 20 to 25 years old.

Moreover, while defense counsel admitted she had focused her preparation on the cases related to Evidence Code section 1109, including those the court had cited in its prior discussion on the issue, rather than *Zack* and *Linkenauger*, we cannot say such a decision was unreasonable based on the record at the time, as the court had not yet excluded Evidence Code section 1109 as a potential basis for admission. (See *In re Valdez* (2010) 49 Cal.4th 715, 729-730 [hindsight is not the standard by which we measure the effectiveness of counsel].) And any potential deficiency was cured shortly thereafter, when the court and counsel reviewed and discussed the pertinent sections of the cases during the hearing. We therefore reject defendant's suggestion that his counsel performed inadequately on this issue.

Second, it appears from the record that defense counsel had originally intended to elicit testimony from the medical examiner, Dr. Chinwah, regarding the presence of small amounts of marijuana and alcohol in Sharon's system at the time of her death. We do not have the toxicology report in the record, or any other evidence from which we could conclude, as defendant urges, that his counsel should have known in advance that Dr. Chinwah would not be able to lay the proper foundation to admit the toxicological results. Nor do we have any basis to believe that defense counsel's decision not to call

46

further witnesses on the issue was not a tactical one, especially in light of the minimal amounts of the substances in Sharon's system and the prosecutor's relevance objection. As such, we cannot say defense counsel's conduct falls outside the "wide range of reasonable professional assistance," necessary to establish ineffectiveness. (*In re Valdez, supra,* 49 Cal.4th at p. 730 [quoting *Strickland, supra,* 466 U.S. at p. 689].) In addition, as we have already discussed, it is unlikely that presentation of this evidence would have resulted in a different outcome for defendant, given the strength of the evidence against him.

Third, turning to the failure to exclude evidence of defendant's prior convictions, defense counsel's performance did not amount to ineffective assistance. Prior to trial, defense counsel obtained a court order bifurcating trial on defendant's prior convictions. When the prosecutor introduced defendant's LAPD interview, defense counsel realized the references to defendant's prior strikes had not been redacted, and immediately objected and obtained a curative admonition. Under the circumstances, we are not persuaded that defense counsel's actions were unreasonable.[22]

Finally, we are not persuaded by defendant's contention that his counsel's failure to object during the prosecutor's closing argument was deficient, rather than a result of trial strategy (see *People v. Williams* (1997) 16 Cal.4th 153, 221 [a defense attorney's failure to object at trial rarely establishes ineffectiveness]), or that counsel's failure to object was prejudicial (see *People v. Kipp, supra*, 26 Cal.4th at p. 1130). Indeed, in his appeal briefs defendant himself suggests several tactical reasons defense counsel might

---

[22] Defendant also complains about his counsel's performance related to an incident immediately following the playing of defendant's interview, where family members of the victim were speaking loudly near jurors during a break. It is unclear from defendant's brief whether, or how, this incident was related to defendant's references to his prior strikes in his interview. Moreover, defense counsel brought the incident to the court's attention. As a result, the prosecutor admonished the family members and the court inquired later that day whether any jurors had overheard anything about the case. No jurors indicated they had. Defendant's contention that his counsel "never followed up on the matter and an inquiry was not conducted" is therefore incorrect.

have chosen not to object during closing argument.  Accordingly, defendant's claim of ineffective assistance fails.

      F.     *Cumulative Error*

Defendant contends that the cumulative effect of the errors raised deprived him of a fair trial.  To the extent we have identified any potential errors, we conclude that any such errors were harmless.  We therefore find that no cumulative error occurred.

## DISPOSITION

The judgment is affirmed.

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

COLLINS, J.

We concur:

WILLHITE, Acting P. J.

MANELLA, J.

48